Thomas JONES, et al., Plaintiffs,

v.

ALLERCARE, INC., et al., Defendants.

No. 1:00CV257.

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 2, 2001.

Thomas D. Robenalt, David W. Skall, No-vak, Robenalt, Pavlik & Scharf, Cleveland, OH, Robert D. Gary, Thomas A. Downie, Gary, Naegele & Theado, Lorain, OH, Mark J. Valponi, Taft, Stettinius & Hollister, Cleveland, OH, Kenneth W. Halpern, Law Offices of Kenneth W. Halpern, Newton, MA, for plaintiffs.

Elizabeth B. Wright, Michael L. Hardy, Gabrielle Sara Moses, Thompson, Hine & Flory, Cleveland, OH, Thomas P. Schult, Shonagh K. Clements, Stinson, Mag & Fiz-zell, Kansas City, MO, for defendants.

### *Memorandum of Opinion and Order*

GAUGHAN, District Judge.

### *INTRODUCTION*

This matter is before the Court upon Plaintiffs' Motion for Class Certification (Doc. 52). This case arises out of plaintiffs' alleged personal injury and property damage following the application of AllerCare Dust Mite Carpet Powder (hereafter "Powder") and/or AllerCare Dust Mite Allergen Spray (hereafter "Spray") to carpeting and/or furniture. For the following reasons, the Motion is DENIED.

### *FACTS*

Plaintiffs are residents of Ohio.[1] (Compl.¶ 2). Defendant is a Wisconsin cor-poration and the manufacturer of the Powder and Spray.[2] (Compl.¶ 9). Defendant mar-keted and distributed the Powder and Spray from August 1999 through January 2000, when the products were removed from the marketplace. (Compl.¶ 9). The Powder and Spray were formulated for household appli-cation to carpeting and furniture for the pur-

---

1. The original Complaint named Thomas Jones as the single plaintiff. (Doc. 1). The Amended Complaint adds Jeffrey Rathbun, Lesley Rathbun and Chase Rathbun as plaintiffs. (Doc. 20).

2. This case originally included Allercare, Inc., S.C. Johnson & Son, John Doe Fragrance Manu-facturer(s) and John Doe Manufacturers as de-fendants. (Doc. 1). Plaintiffs' Amended Com-plaint designates S.C. Johnson & Son, Inc. as the only defendant. (Doc. 20).

pose of controlling dust mite allergens. (Mitchell Aff, Ex. A). The products were marketed to a target group of consumers with asthma and allergies. (Archer & Soto Depos., Ex. 2 at 2–3). Plaintiffs allege, however, that defendant knew or should have known that the Powder and Spray would cause adverse reactions among consumers in general and the target group in particular.

Plaintiffs allege that these adverse reactions were caused in part by the active ingredient, benzyl benzoate. Plaintiffs point out that the United States Environmental Protection Agency (hereafter "U.S. EPA"), observed in its Review of Allercare that "[t]here is scientific literature on benzyl benzoate which bears on its potential to cause adverse effects." (Archer & Soto Depos., Ex. 21 at 7). On the other hand, defendant notes that benzyl benzoate has GRAS (Generally Recognized As Safe) status with the Food and Drug Administration and is approved for use as a food additive. (Mitchell Aff., Ex. A). The Powder contains a benzyl benzoate level of 4.6%. (Archer & Soto Depos., Ex. 21 at 2). The Spray contains a benzyl benzoate level of 18%. (Archer & Soto Depos., Ex. 21 at 2).

In addition, plaintiffs allege that a fragrance in the Powder and Spray was known by defendant to be a trigger for adverse reactions in persons with asthma or allergies. (Archer & Soto Depos., Ex. 1 at 3). Plaintiffs point to defendant's statement that "[l]iterature references support an association of fragrance/perfume and asthma related effects" as an admission. (Supp.Ex. S–1). Product Safety Resources (hereafter "Prosar"), one of defendant's contractors, also noted, "Fragrances have been increasingly cited as 'triggers' of asthma attacks in published peer-reviewed journals." (Archer & Soto Depos., Ex. 30 at 1).

Plaintiffs also allege that the Material Safety Data Sheets for the Powder and Spray confirm that defendant was aware of the propensity of the products to cause respiratory irritation, eye irritation and irritation of the skin. (Archer & Soto Depos., Ex. 18 at 1 & 19 at 1). According to plaintiffs, defendant ignored this fact and included unusually high levels of fragrance in the Pow-

der and Spray. In a response to inquiries by the U.S. EPA regarding the products, defendant stated, "Note that the fragrance levels at 0.72% and 0.4% in the aerosol and carpet powder respectively are relatively high for household cleaning or pesticide products." (Archer & Soto Depos., Ex. 22 at 2).

### Test Marketing Period

During the test marketing period, defendant retained Prosar and utilized its Consumer Resource Center to receive and compile reports from consumers who dialed the 800 number listed on the Powder and Spray labels. (Mitchell Aff., Ex. A). Janet C. Mitchell, defendant's Consumer Liability Manager, avers,

> Customers who called that number initially spoke with personnel employed by ALTA Resources which is located in Neenah, Wisconsin. ALTA personnel provided general information about such things as product availability and proper usage instructions. If a caller stated that she or he had any type of medical complaint or expressed a concern about the product which the ALTA representative could not answer, the caller was transferred immediately to S.C. Johnson's in-house Consumer Resource Center. Additionally, these callers were given the telephone number of Product Safety Resources (Prosar), an independent medical information center, that S.C. Johnson has retained to respond to the inquiries of its customers 24 hours a day.

(Mitchell Aff., Ex. A).

Plaintiffs allege that immediately after the introduction of the Powder and Spray into test markets, symptoms known to be associated with benzyl benzoate and/or the fragrance ingredient were reported by consumers. For example, between August 3 and October 25, 1998, defendant received six calls to its Medical Emergency System. (Archer & Soto Depos., Ex. 7 at 1). However, defendant determined that the "medical severity of these calls [was] very low" and recommended that no action be taken, but the reports continue to be monitored. (Archer & Soto Depos., Ex. 7 at 1). Plaintiffs also allege that during the test marketing period, defendant was warned by a physician about the

effects of the Powder and Spray on persons with asthma and allergies. (Supp.Ex. S–2).

Plaintiffs allege that at the end of the test marketing period, defendant was concerned that the Powder and Spray "might trigger an attack in asthmatics or cause difficulties in allergen-sensitive individuals." (Archer & Soto Depos., Ex. 1 at 3). Because of this, defendant hired Pegus Research, Inc. (hereafter "Pegus") to analyze the causal relationship between the reported symptoms and the Powder and Spray. (Archer & Soto Depos., Ex. 1 at 3).

### Product Release

The Powder and Spray were introduced into the regular consumer market in August 1999. (Mitchell Aff. ¶ 5). The first reported incident relating to the use of the Powder or Spray occurred on August 30, 1999. (Archer & Soto Depos., Ex. 21 at 3). Plaintiffs allege that over the next five months, the reports of adverse reactions increased in direct correlation to the number of units sold. (Archer & Soto Depos., Ex. 5 at 3–4).

An investigator at the U.S. EPA analyzed the number and frequency of reports involving adverse reactions to the Powder and Spray on January 11, 2000. (Archer & Soto Depos., Ex. 21). The investigator stated that, if the number of reports were extrapolated for a full year, "the Allercare Dust Mite Powder almost certainly would account for more serious cases (moderate and major outcome) than any single pesticide product in the residential market." (Archer & Soto Depos., Ex. 21 at 5). Plaintiffs allege that defendant surreptitiously obtained a copy of this report on January 14, 2000. (Archer & Soto Depos., Ex. 21 at 1). However, the U.S. EPA website indicates that it "urged SC Johnson to immediately remove" the Powder and Spray from the marketplace and that defendant had already agreed to do so as of January 14, 2000. (Archer & Soto Depos., Ex.31 at 1). On that date, defendant "committed to immediately stop production and shipment of these products and to remove these products from the marketplace." (Archer & Soto Depos., Ex. 31 at 1). The announcement also stated, "Because of the relatively large number of incidents reported in such a short time frame, EPA urged [de-

fendant] to immediately initiate this product recall." (Ex. 31 to Archer & Soto Depos.). By that time, defendant had sold over 2,700,000 units of the Powder and Spray. (Mitchell Aff. ¶ 5).

Plaintiffs allege that the Powder and Spray were unsafe and unreasonably dangerous and unfit for the purposes for which they were marketed. (Compl.¶ 11). Plaintiffs also allege that in over 30,000 reported instances, the Powder and Spray caused adverse reactions in persons exposed to them. (Compl.¶ 11). Plaintiffs allege that defendant did not adequately test the Powder and Spray and failed to provide adequate warnings and instructions to consumers. (Compl.¶ 11).

Plaintiffs allege that defendant has proposed to put the Powder and Spray back on the market without the fragrance, arguing to the U.S. EPA that this would reduce or eliminate the adverse reactions. (Archer & Soto Depos., Ex. 27).

The U.S. EPA noted that the close proximity in time between the exposure and the adverse reactions provides strong evidence of causation, "ruling out the possibility that the reactions were simply coincidental with use." (Archer & Soto Depos., Ex. 21 at 5). The U.S. EPA also concluded that "many, if not most of the moderate and major (severe) reactions to Allercare Dust Mite Carpet Powder are due to the added fragrance." (Archer & Soto Depos., Ex. 21 at 10). In fact, defendant admitted to the U.S. EPA through John H. Hainze, Ph. D., defendant's Manager of Research and Development, "The weight of evidence that we have collected supports causation by the fragrance for the adverse effects we have observed." (Archer & Soto Depos., Ex. 22 at 12).

Dr. Philip H. Taylor, Group Leader of Environmental Sciences and Engineering at the University of Dayton Research Institute, compared readings from the Powder with air samples taken in homes where it had been used. (Supp.Ex. S–5). Dr. Taylor concluded that approximately thirty chemicals are emitted from the Powder. (Supp.Ex. S–5). Dr. Taylor also found that, months after the Powder's use, twenty of the chemicals were

present in one of the homes and seventeen in another. (Supp.Ex. S–5). Other of plaintiffs' experts have concluded that a causal connection exists between the fragrance ingredient and the adverse reactions. (Supp. Ex. S–6, S–7).

The Amended Complaint sets forth five causes of action. Count One alleges that the Powder and Spray were defectively manufactured. Count Two alleges that the Powder and Spray were defective in formulation and design. Count Three alleges that the Powder and Spray were defective due to inadequate warning or instruction. Count Four alleges that the Powder and Spray did not conform to express or implied warranties or other representations of defendant. Count Five alleges that defendant was negligent with regard to each of the above counts.

Plaintiffs move the Court to certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3). Plaintiffs seek certification of a plaintiff class as follows:

> Every person known to S.C. Johnson or otherwise identifiable who is reported to have suffered personal injury and/or property damage following the application of AllerCare Dust Mite Carpet Powder and/or AllerCare Dust Mite Allergen Spray to carpeting and/or furniture.

## STANDARD FOR DETERMINING WHETHER TO CERTIFY CLASS ACTION

■ The decision to certify a class action is within the discretion of the district court, but that discretion must be exercised within the framework set forth in Federal Rule of Civil Procedure 23. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); *Cross v. National Trust Life Ins. Co.,* 553 F.2d 1026, 1029 (6th Cir. 1977). Before certifying a class, the district court must conduct a rigorous analysis of the Rule 23 prerequisites. *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The party moving for certification bears the burden of showing that the requirements for certification are met. *In re American Medical Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996).

Rule 23 sets forth a two-part test for certifying a class action. First, the four prerequisites in 23(a) must be met. Rule 23(a) states,

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Assuming the threshold requirements of numerosity, commonality, typicality and adequacy of representation set forth in Rule 23(a) are met, "parties seeking certification must also show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 638, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Plaintiffs argue that this action can be maintained under Rule 23(b)(3), which requires the court to find

> that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

■ Decisions on class certification should not be conditioned on the merits of the case. However, the Court may go beyond the pleadings to the extent necessary "to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996)

(citing Manual for Complex Litigation § 30.11 at 214 (3d ed.1995)). *See also Falcon*, 457 U.S. at 160, 102 S.Ct. 2364 ("Sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."). Therefore, this Court has examined depositions, affidavits and expert reports in determining whether class certification is appropriate.

## PLAINTIFFS' ALLEGATIONS REGARD CLASS CERTIFICATION

Plaintiffs contend that the adverse reactions reported by consumers display a high degree of similarity. The U.S. EPA noted in its review of the Powder that the "majority of cases, specifically mentioned a problem with the odor." (Archer & Soto Depos., Ex. 21 at 5).

Plaintiffs also allege that the vast majority of callers experienced adverse reactions within a short time after using the Powder or Spray. Plaintiffs claim that Prosar's records indicate that 62% of the callers experienced symptoms within fifteen minutes and 70% did so within an hour.[3] (Supp.Ex. S–3).

Plaintiffs also contend that the vast majority of consumers who reported distinct symptoms were exposed to the Powder and Spray in the same way and experienced the same types of symptoms. For example, at least 74%, and perhaps as much as 83%, of the callers handled by Prosar were exposed to the products as a result of inhalation. (Supp. Ex. S–3; Archer & Soto Depos., Ex. 29 at 1). In addition, inhalation, dermal contact and ocular contact account for 85% of the reports. (Supp.Ex. S–3). Plaintiffs claim that the vast majority of reports involved respiratory, dermal and ocular symptoms, including asthma attacks, respiratory problems, burning sensations and skin irritation.

Plaintiffs allege that many consumers have also incurred related property damage, including multiple cleanings and carpet remov-

al. The U.S. EPA noted, "Cleaning to remove the odor was often difficult, had to be performed multiple times, and in some cases carpeting had to be removed." (Archer & Soto Depos., Ex. 21 at 5).

## THE REPRESENTATIVE PLAINTIFFS

### Thomas Jones [4]

Thomas Jones is a 62–year–old man who lives in an apartment in the Cleveland area. (Jones Depo. 5, 39). Mr. Jones purchased both the Powder and Spray based on advertisements and on the recommendation of a friend. (Jones Depo. 4, 12–13). Mr. Jones used both products on two occasions in December 1999. (Jones Depo. 3, 26). Mr. Jones applied the products to his carpeting, drapes and mattress. (Jones Depo. 22–24, 30). The smell of the Powder and Spray did not bother him. (Jones Depo. 23). Mr. Jones did not have an immediate reaction to the products. (Jones Depo. 34). However, Mr. Jones claims that a day after fist using the products his eyes began to water and his breathing was "a little different." (Jones Depo. 34). He believed he may have used too much and "was a little heavy handed with it." (Jones Depo. 34).

Mr. Jones claims that now his esophagus tightens when he drinks liquids and that his skin turns red and tingles after he showers. (Jones Depo. 8, 15–16). Mr. Jones has not missed any work or been affected in his ability to perform either his full-time job with First Energy or his part-time job as a police patrolman because of a physical reaction to the products. (Jones Depo. 440–46). Mr. Jones has complained of his symptoms to several physicians, but none have linked his complaints to the Powder or Spray. (Jones Depo. 10–12, 58–60).

Mr. Jones has pre-existing seasonal allergies for which he has taken various medications in addition to glaucoma. (Jones Depo. 13–15, 63–67). Mr. Jones's landlord

---

**3.** An examination of plaintiffs' Supplemental Exhibit S–3 reveals that Prosar's records indicate that only 38% of the callers experienced symptom onset within fifteen minutes and only 49% did so within an hour.

**4.** As noted above, Mr. Jones was the only plaintiff originally. On January 19, 2000, approxi-

mately five days after the Powder and Spray were recalled by defendant, Mr. Jones called defendant's 800 number. (Mitchell Aff., Ex. A). Mr. Jones recorded that telephone conversation with defendant's representative. (Dft.Ex. 2). Eight days later, on January 27, 2000, Mr. Jones filed this lawsuit. (Doc. 1).

replaced the carpeting in his apartment as a part of its regular maintenance of the building, and Mr. Jones replaced his mattress and drapes. (Jones Depo. 34–35, 78).

### Lesley Rathbun

Lesley Rathbun purchased the Powder in October 1999, because her son Chase is allergic to dust mite allergens. (L. Rathbun Depo. 3–7). Mrs. Rathbun noticed the strong smell of the Powder as she used it, but did not have an immediate reaction. (L. Rathbun Depo. 11). Mrs. Rathbun "started feeling queasy and like headachy" when she began to vacuum the powder up a half hour later. (L. Rathbun Depo. 11). By evening Mrs. Rathbun felt fine. (L. Rathbun Depo. 13).

Mrs. Rathbun has not sought medical treatment and has not experienced any further reaction to the Powder since the day it was used. (L. Rathbun Depo. 19).

Mrs. Rathbun takes a beta blocker for heart arrhythmia and mitral valve prolapse, has peripheral neuropathy, has chronic kidney stones, has been treated for mild infertility endometriosis, had a tumor removed from her head, had her tonsils removed as a child, has psoriasis, food allergies and seasonal allergies for which she takes Claritin. (L. Rathbun Depo. 93–96).

### Chase Rathbun

Chase Rathbun is eleven years old. (C. Rathbun Depo. 3). Chase noticed and did not like the Powder's odor when he came home from school. (C. Rathbun Depo. 7; L. Rathbun Depo. 14). He experienced a headache, wheezing and coughing that afternoon which lasted for a few minutes, until he went outside. (L. Rathbun Depo. 15–17; C. Rathbun Depo. 8). When he came back in for dinner he did not wheeze or cough. (L. Rathbun Depo. 16).

Chase has not sought medical treatment and has not experienced any further reaction to the Powder since the day it was used. (L. Rathbun Depo. 13, 16–17, 19).

Chase has a history of pre-existing allergies and asthma. (L. Rathbun Depo. 88). Chase also has a history of strep throat, rashes and eczema, had his tonsils and adenoids removed and had impetigo. (L. Rathbun Depo. 91–92).

### Jeffrey Rathbun

Jeffrey Rathbun immediately found the smell of the Powder to be overwhelming when he arrived home the night it was used. (J. Rathbun Depo. 76). However, he did not have an immediate reaction to the Powder. (J. Rathbun Depo. 19). Mr. Rathbun developed hives during the night after application of the Powder. (J. Rathbun Depo. 76; L. Rathbun Depo. 64–65). Mr. Rathbun continues to experience hives unless he takes several antihistamines. (J. Rathbun Depo. 59–60; L. Rathbun Depo. 66, 86). Since the application of the Powder, the longest Mr. Rathbun has gone without taking an antihistamine is approximately 36 hours. (J. Rathbun Depo. 78). It was not until after he read about the lawsuit in the newspaper that Mr. Rathbun associated his hives with his wife's use of the Powder. (J. Rathbun Depo. 44–45).

Mr. Rathbun's family doctor did not make a link between his symptoms and the Powder. (J. Rathbun Depo. 57–58). However, another doctor felt strongly that the two could be related. (J. Rathbun Depo. 58).

Mr. Rathbun has a history of vitiligo (depigmentation of the skin). (J. Rathbun Depo. 29–30).

The Rathbuns have steam cleaned their carpeting twice themselves and had it professionally cleaned once at defendant's expense. (L. Rathbun Depo. 61). In addition, after a fire, a portion of the Rathbuns' carpeting was replaced and their furniture was professionally cleaned. (L. Rathbun Depo. 27–29).

### DISCUSSION

Plaintiffs assert that this action meets the requirements for certification under Rule 23(a) and (b)(3).

Defendant disputes that the requirements for certifying a class action under Rule 23 are met. The main focus of defendant's brief is that plaintiffs have failed to satisfy the predominance and superiority requirements of Rule 23(b)'(3). Defendant also argues that plaintiffs have failed to establish typicality as required by Rule 23(a).

*The Requirements of 23(a): Numerosity, Commonality, Typicality and Adequacy*

### Numerosity

■ Numerosity exists if the "class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Although "there is no strict numerical test for determining impracticability of joinder..., the impracticability requirement is usually satisfied by the numbers alone" when the class is very large. *American Medical Sys.,* 75 F.3d at 1079; *Cross v. National Trust Life Ins. Co.,* 553 F.2d 1026, 1030 (6th Cir. 1977) ("when class size reaches substantial proportions...the impracticability requirement is usually satisfied by numbers alone.").

■ Plaintiffs seek certification of a class which includes over five thousand people who called defendant's 800 number and whose names and addresses were recorded by Prosar or the Consumer Resource Center. Defendant does not dispute that the numerosity requirement is met. This Court finds that a proposed class of over five thousand is so numerous that joinder would be impractical. Thus, the numerosity requirement is met.

### Commonality

Commonality exists if there are "questions of law or fact common to the class." The Sixth Circuit recently explained the commonality requirement in *Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir.1998):

> The commonality requirement deals with shared questions of law or fact. Although Rule 23(a)(2) speaks of "questions" in the plural, we have said that there need only be one question common to the class. It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What we are looking for is a common issue the resolution of which will advance the litigation.

(citation omitted).

■ If there is a common issue of law or fact that will advance the litigation, the "mere fact that questions peculiar to each individual member of the class remain after the common questions of defendants' liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988).

In their motion for certification, plaintiffs argue that the following legal issues are common to the proposed class and that their resolution will advance the litigation of this case:

▶ whether the products were adequately tested;

▶ whether defendant knew or should have known of one or more of the risks associated with the products;

▶ whether the foreseeable risks associated with the products exceeded the benefits associated with them;

▶ whether the products were more dangerous than an ordinary consumer would expect;

▶ whether defendant failed to provide warnings or instructions concerning the products that a manufacturer exercising reasonable care would have provided;

▶ whether the products deviated from defendant's design specifications, formula or performance standards; and

▶ whether the products failed to conform to warranties or other representations of defendant.

However, in their Reply Brief plaintiffs state that, although they protectively plead five product liability claims, "the case involves only two primary issues: defective formulation or design, and failure to warn." (Reply at 4 n.1). Thus, plaintiffs have apparently abandoned the theories of defective manufacture, non-conformity with representations and negligence.

■ Again, defendant does not dispute that the commonality requirement is met. This Court finds that plaintiffs have presented sufficient common questions of law to satisfy the commonality requirement. The issues of defendant's defective formulation or design of the Powder and Spray and its failure to provide reasonable warnings or instructions concerning the products are

common to all those allegedly injured by the Powder and/or Spray.

**Typicality**

■■■ Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The typicality requirement focuses on "the similarities between the named plaintiffs' claims and those of the class as a whole." *Blaz v. Galen Hosp. Ill., Inc.,* 168 F.R.D. 621, 624 (N.D.Ill.1996). As the Sixth Circuit stated in *American Medical Systems,*

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members.

75 F.3d at 1082 (citation omitted). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague,* 133 F.3d at 399. Where the substantive claims depend on individual permutations, however, the claims of the named plaintiffs who have the same general complaint against the defendant as the class are not typical. *Id.*

■■■ Plaintiffs argue that the named plaintiffs satisfy the typicality requirement because they used the Powder and Spray in essentially the same manner as did the proposed class members and experienced adverse physical reactions and incurred property damage and expenses. Thus, plaintiffs claim, the named plaintiffs' claims arise from the same event, practice or course of conduct that gives rise to the claims of the proposed class members and are based on the same legal theory.

Defendant argues that plaintiffs have failed to establish that the claims of the named plaintiffs are typical of the claims of members of the proposed class. Defendant argues that because each member of the proposed class must prove individual facts, including the use of the Powder or Spray and a causal connection between that use and the alleged injury, damages and defenses will also have to be adjudicated individually. Thus, defendant argues, even if the named plaintiffs establish their individual claims, defendant's liability to the rest of the proposed class will not be proven. In addition, defendant highlights the differences among the named plaintiffs' use of and reaction to the products and their pre-existing conditions. Among the members of the class as a whole, defendant argues that these differences will only be compounded.

In response, plaintiffs argue that the issue of general causation is common to the proposed class and capable of classwide adjudication. Plaintiffs argue that a verdict in favor of the named plaintiffs would establish that the Powder and Spray are capable of causing the injuries reported by the proposed class members and that defendant is legally responsible for compensating all individuals whose injuries are attributable to the products. Thus, plaintiffs claim, the common classwide issues are essentially the same for the named plaintiffs as for the proposed class members.

A central issue in this case will be causation. Plaintiffs contend that the Powder and Spray caused them to experience adverse physical reactions and to incur property damage and expense. Defendant denies these allegations. Issues of proximate causation break down into two component parts:

> a showing of threshold general causation, i.e., the risk or harmful effects of the defendants' conduct, and proof that the defendants' wrongful conduct was directly or proximately connected with the injuries

specifically suffered by the named plaintiff or class member.

3 Newberg on Class Actions § 17.24.

With regard to the issue of general causation, plaintiffs have satisfied the typicality requirement. The named plaintiffs' personal injury and property claims are typical since they arise from the same event, practice or course of conduct (defendant's manufacture and sale of the Powder and Spray) that gives rise to the claims of the proposed class members. In addition, the named plaintiffs' claims are based on the same legal theory (defective formulation or design and failure to warn) as the claims of the proposed class members. *See* 3 Newberg on Class Actions § 17.24 (stating that general causation "usually constitutes a common question because it can normally be determined without regard to claims of specific individuals.").

· However, because the proposed class members' substantive claims depend on individual permutations, the fact that the named plaintiffs have the same general complaint against the defendant does not render their claims typical. *Sprague,* 133 F.3d at 399. Each plaintiff must individually prove that he or she experienced personal injuries and/or property damage which was proximately caused by the use of defendant's products. The named plaintiffs' claims are typical only if what is needed to prove them is the same as what is needed to prove the claims of the proposed class. 3·Newberg on Class Actions § 17.11.[5]

In *In re Agent Orange Product Liability Litigation,* 818 F.2d 145 (2d Cir.1987), the court addressed the issues of general and individual causation. The court found that litigation of the general, or generic, causation issue could have three possible outcomes: (1) that exposure to Agent Orange always causes harm; (2) that it never causes harm; and (3) that it may or may not cause harm depending on the kind of exposure and perhaps

other factors. *Id.* at 164–165. The court noted that it was undisputed that exposure to Agent Orange did not automatically cause harm, but there was evidence that some kinds of exposure might. *Id.* at 165. The court then continued, stating,

> The relevant question, therefore, is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it did cause harm and to whom. That determination is highly individualistic, and depends upon the characteristics of individual plaintiffs (e.g. state of health, lifestyle) and the nature of their exposure to Agent Orange.

*Id. See also Blaz,* 168 F.R.D. at 625 (stating that "variations among individuals with respect to exposure and effects [of x-ray therapy] can vitiate a finding of typicality"); *Ikonen v. Hartz Mountain Corp.,* 122 F.R.D. 258, (S.D.Cal.1988) (finding typicality requirement not met where pet owners brought class action for injuries to pets caused by defendant's flea and tick spray because "each animal will have been injured in different ways and to different degrees by Blockade. Each pet owner, for purposes of emotional distress claims, will have been affected in different ways and to different degrees"). *Cf. Wadleigh v. Rhone–Poulenc Rorer, Inc.,* 157 F.R.D. 410, 417 (N.D.Ill. 1994) (finding typicality requirement met where members of proposed class allegedly contacted HIV as a result of defendant's negligence in collecting and distributing contaminated blood plasma).

In *Puerto Rico v. M/V Emily S,* 158 F.R.D. 9 (D.P.R.1994), a class action suit for personal injuries allegedly caused by an oil spill, the plaintiffs sought to prove that exposure to vapors from the spill caused their injuries. In denying class certification, the court held,

> [A]ny injuries would be dependent upon the numerous variables present, including

> those of class members in such cases with respect to individual issues of proximate cause and unique unliquidated damages, so the representative cannot adequately represent the class in litigating those individual issues. ⌐

3   Newberg on Class Actions § 17.11.

---

5.   Newberg states,

> In products liability and toxic tort class suits involving personal injuries, the major uncommon individual issues entitled to individual determinations are those relating to proximate cause and amount of unliquidated damages.... The claims of the class representatives are, by definition, not typical of

such matters as personal susceptibility to harm, and degree, nature and duration of exposure. No such claim can truly be "typical."

*Id.* at 14.

In this case, plaintiffs do not allege that the Powder and Spray automatically cause adverse reactions in all those exposed to the products. As stated above, approximately 2.7 million units of the Powder and Spray were sold. However, the number of people alleged to have experienced adverse reactions to the products is a mere fraction of that total. Thus, the relevant question in this case will not be whether the products have the capacity to cause harm, but whether the products caused harm and to whom. Thus, the real causation issue in this case is individual, not general, in nature. As in *Emily S,* proof of causation will depend on individual factors such as the nature of each plaintiff's exposure and personal susceptibility.

In addition, while class certification is not precluded merely because proximate cause must be proven individually, where plaintiffs' claims depend on individual facts, the typicality requirement is not met. 3 Newberg on Class Actions § 17.24; *Sprague,* 133 F.3d at 399. In *American Medical Systems,* the Sixth Circuit discussed the typicality of the named plaintiffs in a class action against a penile implant manufacturer and its parent for personal injuries and medical monitoring. Citing Newberg on Class Actions, the court stated,

> A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members.

75 F.3d at 1082. Mr. Vorhis, one of the named plaintiffs, had undergone numerous surgeries in addition to the implants. Thus, as to this plaintiff, the court stated that "it is hard to imagine that Vorhis' claim is typical of the class certified in this case." *Id.* Plaintiff York used an implant model which failed to fully inflate, plaintiff Kennedy alleged that his implant malfunctioned because the cylinders and pump leaked and Plaintiff Gorday alleged that one implant failed and another inflated on one side only. *Id.* Finding that the plaintiffs had failed to satisfy the typicality requirement, the court stated, "These allegations fail to establish a claim typical to each other, let alone a class." *Id.*

In this case, all of the named plaintiffs used the Powder and/or the Spray. In addition, their injuries are alleged to have been caused by ingredients common to both products: benzyl benzoate and/or fragrance. Thus, this case does not involve issues of multiple manufacturers, distributors or products. However, with regard to issues of proximate causation and injuries, the claims of the named plaintiffs are neither typical of each other nor of the proposed class.

Thomas Jones alleges that he used both products twice and now experiences difficulty swallowing as well as redness and tingling of the skin after showering. Mr. Jones first experienced a reaction to the products a day after using them. Lesley Rathbun used the Powder once and experienced short-lived nausea and a headache approximately a half hour after first using the product. Chase Rathbun entered his home shortly after application of the Powder and immediately experienced a headache, wheezing and coughing for a few minutes. Jeffrey Rathbun alleges that he has developed severe chronic hives as a result of his wife's use of the Powder. Mr. Rathbun's reaction began during the first night after the Powder was used. In addition to their differing reactions, each plaintiff has a different medical history ranging from food and seasonal allergies to severe allergies and asthma, rashes and eczema and depigmentation of the skin.

As plaintiffs point out, the alleged reactions of the proposed class include respiratory, dermal and ocular symptoms, including asthma attacks, respiratory problems, burning sensations and skin irritation. Mr. Jones' skin irritation is typical of these claims, but his esophagus troubles appear to be unique. In addition, the continuation of

his symptoms is not typical.[6]. Lesley Rathbun's symptoms were different from those of the proposed class members. Chase Rathbun's wheezing and coughing may be characterized as a respiratory problem, although neither he nor his mother described the incident as an asthma attack. Jeffrey Rathbun's hives qualify as skin irritation, but their severity and duration are not typical of the symptoms of the proposed class members.

Plaintiffs also claim that 62% of the callers experienced symptoms within fifteen minutes and 70% did so within an hour. However, only Mrs. Rathbun and Chase experienced symptoms within that period of time. As stated above, Mrs. Rathbun's symptoms are not typical of those of the other proposed class members.

In addition, even if the named plaintiffs were successful in proving general causation, i.e., that defendant's products were capable of producing injuries of the types allegedly suffered by the named plaintiffs, this would not necessarily advance the interests of the members of the proposed class. By proving that the Powder and Spray could cause tightening of the esophagus, reddening of the skin after showering, short-term headaches and nausea, short-term wheezing and coughing and chronic hives, plaintiffs have done nothing to further the claims of the proposed class members who experienced bronchospasm, dyspnea (abnormal or uncomfortable breathing), hyperventilation, pulmonary edema (an abnormal accumulation of fluid in the lung tissue), respiratory arrest, respiratory depression, nasal irritation, shortness of breath, sneezing and/or ocular irritation. *See* Supp. Ex. S–3.

Similar to the plaintiffs in *American Medical Systems,* the named plaintiffs' claims in this case are neither typical of each other nor of the proposed class. For these reasons, plaintiffs have failed to establish the typicality requirement.

**Adequacy of Representation**

■ Rule 23(a)(4) requires that the named plaintiffs demonstrate that they will "fairly and adequately protect the interests of the class." Since final judgment in a class action is binding on all class members, adequate representation is "essential to due process." *American Medical Sys.,* 75 F.3d at 1083. The Sixth Circuit has articulated two criteria for determining adequacy of representation:

1) the representative must have common interests with unnamed members of the class, and

2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.

*Id.* (quoting *Senter v. General Motors Corp.,* 532 F.2d 511 (6th Cir.1976)). The requirement that the named representative have common interests with unnamed members of the class overlaps to some extent with the typicality requirement because if typicality is not present, the class representatives do not have an incentive to vigorously prosecute the class claims. *Id.* However, the adequacy of representation requirement is broader than the typicality requirement. A representative plaintiff may have typical claims but not be an adequate representative because of some kind of antagonism or conflict of interest with the class. *Id.*

Plaintiffs argue that the named plaintiffs are vigorously prosecuting this action and that their interests are not antagonistic to the interests of the proposed class members. In addition, plaintiffs claim that their counsel have broad experience in class litigation, products liability and other tort cases and are fully qualified to prosecute this action.

Defendant does not dispute that plaintiffs will adequately represent the proposed class. However, while there is no evidence that the named plaintiffs' claims conflict with or are antagonistic to the claims of other members of the class, typicality is subsumed in the adequacy of representation test of Rule 23(a)(4). *See American Medical Sys.,* 75 F.3d at 1083. As stated above, plaintiffs' claims are not typical of the class. Therefore, plaintiffs cannot adequately represent the class.

---

**6.** At most, 6% of the callers to Prosar indicated that their symptoms had lasted longer than a month.

### The Requirements of Rule 23(b)(3)

Even assuming plaintiffs could meet all of the mandatory requirements of Rule 23(a), in order to demonstrate that certification is appropriate, plaintiffs must also demonstrate that the action satisfies one of the subcategories of Rule 23(b). Plaintiffs argue that this action satisfies the requirements of Rule 23(b)(3).

Rule 23(b)(3) requires that plaintiffs show two things in order to obtain certification. Plaintiffs must show that common issues "predominate" over individual issues and that the class action device is "superior" to other available means of adjudicating the controversy. As set forth above, the relevant factors include

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. Pro. 23(b)(3).

### Predominance

■ Plaintiffs argue that two common legal issues predominate in this case: liability and general causation. Plaintiffs claim that the same liability issues listed above are not only common to the named plaintiffs and the proposed class, but also predominant. In addition, plaintiffs argue that the question of general causation, i.e., whether defendant's products were capable of producing injuries of the types allegedly suffered by plaintiffs, predominates.

Defendant argues that individual issues predominate in this case. According to defendant, in order to establish liability, each individual plaintiff must prove that (1) he or she used the Powder or Spray; (2) the product was defective; and (3) the defect caused the plaintiff's injuries. Arguing that causa-

tion is an individual inquiry, defendant points out that each plaintiff's unique pre-existing medical conditions will complicate issues of causation in this case. The proposed class members also experienced various routes of exposure and made widely-varying complaints.[7] In addition, defendant asserts that it has a variety of affirmative defenses available under the laws of each state and the District of Columbia, including contributory negligence, comparative negligence, assumption of the risk, misuse, failure to mitigate, intervening and superseding cause, open and obvious defect, spoliation and accord and satisfaction. Defendant argues that each of these affirmative defenses will require individual adjudication. Finally, defendant argues that the large variety of state laws which will have to be applied to this case prevents common issues from predominating.

■ The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231. Rule 23(b)(3) assumes that common issues of fact or law have already been established under Rule 23(a)(2). Therefore, "the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022 (9th Cir.1998). Instead, the predominance requirement focuses on the relationship between the common and individual issues. *Id.*

■ "All class members need not be identically situated upon all issues, so long as their claims are not in conflict with each other." *In re Ford Motor Co. Ignition Switch Products Liability Litigation,* 194 F.R.D. 484, 488 (D.N.J.2000). However, the individual differences must be of lesser overall significance and manageable in a single class action. *Id.*

"Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231. In addition, some mass tort cases arising from a

---

**7.** Defendant also points out that the Prosar database on which plaintiff intends to rely in identifying the proposed class members contains only

self-reports of adverse reactions unsupported by clinical investigation.

common cause or disaster may satisfy the predominance requirement. *Id.* However, certification in products liability cases is less favored than certification in securities litigation. *Hum v. Dericks,* 162 F.R.D. 628, 639 (D.Hawai'i 1995). Even in mass tort cases, predominance requires much more than merely a shared experience among the proposed class members. *Amchem,* 521 U.S. at 624–625, 117 S.Ct. 2231.

As stated above, plaintiffs' claims are not typical of the proposed class members, and proof of general causation as to the named plaintiffs will not necessarily establish general causation as to the remainder of the proposed class. Thus, plaintiffs have failed to satisfy 23(b)(3) because common issues do not predominate in this case. Rather, this case turns primarily on individual issues. Each named plaintiff has a different complaint with different symptoms, point of onset and duration.

Plaintiffs rely heavily on *Sterling,* 855 F.2d 1188, to support their argument that issues of general causation predominate over individual issues of proximate cause. In *Sterling,* the Sixth Circuit indicated its approval of the trial court's bifurcation of the trial:

> Thus, the court, as is appropriate in this type of mass tort class action litigation, divided its causation analysis into two parts. It was first established that Velsicol was responsible for the contamination and that the particular contaminants were capable of producing injuries of the types allegedly suffered by the plaintiffs. Up to this point in the proceeding, the five representative plaintiffs were acting primarily in their representative capacity to the class as a whole. This enabled the court to determine a kind of generic causation—whether the combination of the chemical contaminants and the plaintiffs' exposure to them had the capacity to cause the harm alleged. This still left the matter of individual proximate cause to be determined. Although such generic and individual causation may appear to be inextricably intertwined, the procedural device of the class action permitted the court initially to assess the defendant's potential liability for its conduct without regard to the individual

components of each plaintiff's injuries. However, from this point forward, it became the responsibility of each individual plaintiff to show that his or her specific injuries or damages were proximately caused by ingestion or otherwise using the contaminated water.

*Id.* at 1200. *Sterling* is distinguishable from the facts of this case in two important ways: (1) defendant did not dispute that the named plaintiffs' claims were typical of the proposed class; and (2) less than one hundred plaintiffs were required to establish individual causation. In this case, proof of general causation as to the named plaintiffs will not necessarily establish general causation for the entire proposed class because the named plaintiffs are not typical. In addition, plaintiffs claim that over five thousand members of the proposed class exist. While common issues may have predominated in *Sterling,* a case with relatively few plaintiffs located within a matter of miles of the defendant's facilities, individual issues predominate in this case, which involves the claims of over five thousand potential class members, each governed by his or her state laws.

In *Ilhardt v. A.O. Smith Corp.,* 168 F.R.D. 613 (S.D.Ohio 1996), the court granted the defendants' motion to decertify the class in a products liability case alleging defective design. Noting that it would be required to apply the substantive product defect law of more than 40 states, the court listed several differences among their product liability laws:

(a) The "test" that each state requires in determining whether a product is defective.

(b) The time at which the jury must judge the defectiveness of the product.

(c) Whether state law forbids or requires the jury to be instructed on the definition of "unreasonably dangerous."

(d) Whether it is plaintiffs' or defendants' burden to prove defectiveness.

(e) Whether the individual states even recognize a cause of action in strict products liability.

*Id.* at 620. Because of these state law differences, in addition to the varying available

affirmative defenses, comparative fault rules and punitive damage standards, the court held that common issues of law did not predominate. *Id.*

Similarly, in *Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J.1998), the court found that common issues did not predominate for three reasons: (1) even basic questions regarding the alleged defectiveness of the defendant's product would depend on the application of the law of all 50 states and on facts particular to each plaintiff; (2) the plaintiffs had failed to show that issues such as privity, reliance and the defendant's affirmative defenses could be adjudicated on a class-wide basis; and (3) class-wide disposition of claims based on the law of each plaintiff's home state "would essentially be impossible." 182 F.R.D. at 455.

Because individual legal and factual issues predominate in this case, plaintiffs have failed to satisfy the predominance requirement.

**Superiority**

■ Plaintiffs argue that the superiority requirement is met in this case because certification will permit classwide adjudication of all liability issues as well as the issue of general causation. Otherwise, plaintiffs claim, adjudication of the proposed class members' claims will require thousands of lawsuits. In addition, plaintiffs argue that individual issues do not defeat the superiority requirement in this case since classwide claims predominate and this Court will be able to achieve considerable efficiency through collective adjudication. Plaintiffs argue that issues of individual causation can be easily handled after classwide adjudication of defendant's liability and general causation through alternative dispute resolution, settlement or the appointment of a special master. Plaintiffs also argue that differences in state law do not render class certification improper since this Court may apply Ohio law to all the claims or may group together claims under similar state laws.

Defendant argues that a class action is not the superior method for adjudication of the alleged claims because a workable plan does not exist which would allow resolution of the many individual factual and legal issues for each member of the proposed class. Defendant also points out that this is the first lawsuit filed in connection with the Powder and Spray and argues that this fact weighs against certification since there is no prior trial track record for this Court to analyze. In addition, defendant argues that differences among the applicable state laws renders a class action unmanageable. Defendant contends that allowing each member of the proposed class to bring a separate lawsuit against it is superior, particularly in light of the fact that many of the members of the proposed class have already been satisfied by defendant's efforts.

Janet Mitchell, defendant's Consumer Liability Manager, avers,

> When a customer expresses a concern or complaint about any S.C. Johnson product, it is our job at CRS [Consumer Resource Center] to resolve their concerns and to satisfy the customer, if possible. We have done this with regard to many of the Aller-Care(TM) calls that we have received. For example, some customers, who reported that they had what they felt were reactions to their use of the product, requested that we have their homes cleaned. We either reimbursed these customers for their cleaning efforts or worked with them to schedule and pay for cleaning by various contractors. Other customers asked us to replace their carpets or pieces of furniture. If these requests seemed reasonable and if we in the CRC felt that by doing so we could resolve our customer's concerns and potential claims, we assisted our customers with these replacement efforts....CRC has been able to resolve many of the claims that have been made that relate to AllerCare(TM) by the customers who have called S.C. Johnson. These settlements are evidenced either by the signature of these callers on releases on the back of settlement checks that were sent to them or by signed releases for property damage claims and/or personal injury claims....In a relatively small number of instances, CRC has been unable to resolve or settle the medically related claims of the consumers who have called the company. Those unresolved claims are referred to Craw-

ford & Company ("Crawford")....To date, approximately 300 claims have been referred to Crawford. Based upon information that I have received from Crawford regarding the status of these claims, more than 60% of them have been resolved in whole or in part.

(Mitchell Aff. ¶¶ 10, 13–14).

Plaintiffs respond by stating that a workable trial plan does exist. Plaintiffs seek a single trial of the common classwide issues of liability and general causation. According to plaintiffs, such a trial will resolve the central issues for all class members and leave few individual issues for fewer class members to be resolved in subsequent proceedings.

Class actions are not necessarily to be disfavored in mass tort cases. In *Sterling*, 855 F.2d at 1196–1197, the Sixth Circuit stated,

The procedural device of a Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort, and expense. However, the problem of individualization of issues often is cited as a justification for denying class action treatment in mass tort accidents. While some courts have adopted this justification in refusing to certify such accidents as class actions, numerous other courts have recognized the increasingly insistent need for a more efficient method of disposing of a large number of lawsuits arising out of a single disaster or a single course of conduct. In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible....In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies

to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy. However, where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.

(citations and footnotes omitted). *See also* Fed.R.Civ.P. 23, Advisory Committee Notes to 1966 Amendment ("A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.")

This case does not involve a mass tort accident. All the proposed class members' claims were allegedly caused by a single course of conduct: the marketing and sale of the Powder and Spay in a defective condition and/or without adequate warnings. However, as stated above, the individual issues of proximate cause predominate in this case. Each plaintiff's claim is dependent on his or her sensitivity to the products and the nature of his or her exposure and alleged reaction.

Rule 23(b)(3)(A) instructs courts to consider "the interests of members of the class in individually controlling the prosecution or defense of separate actions." Neither party has presented any evidence or set forth an argument regarding this factor. However, it is likely that plaintiffs in the proposed class who have experienced relatively minor and short-lived symptoms would not benefit from having Mr. Jones or Mr. Rathbun, who both allege chronic injuries, represent them.

Under Rule 23(b)(3)(B), this Court must consider whether there is "any litigation concerning the controversy already commenced by or against members of the class." There are currently five cases pending

against defendant which involve the Aller-Care products. (Deft. Mot. at vii). All five were commenced after the filing of this case. In addition, as noted above, defendant has already resolved the claims of many of those people plaintiffs seek to include in the proposed class. *See Chin*, 182 F.R.D. at 463 (finding that where defendant's voluntary recall program already provided much of the same relief sought by plaintiffs, class action was not the superior method of adjudication).

This Court must also consider the desirability of proceeding in this forum under Rule 23(b)(3)(C). This Court assumes that the named plaintiffs chose this forum because they are Ohio residents. However, they have failed to assert or demonstrate the superiority of this forum. If the proposed class were defined in such a way that Ohio law would govern all the class members' claims, this forum would certainly be most desirable. *See Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 680 (N.D.Ohio 1995). However, since the class is currently defined to include plaintiffs nationwide, requiring the law of each state to be applied to the appropriate plaintiffs' claims, there is no particular basis for determining the desirability of this forum.[8] *Id.*

Rule 23(b)(3)(D) requires this Court to consider the manageability of this action if certification were to be granted. The Supreme Court has stated that the manageability analysis "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Maintenance of the class action plaintiffs seek presents obvious manageability problems. Because there are so many individual issues of cause and effect, trying this case as a class action would require an overwhelming number of "mini-trials" on these issues. *See Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 98 (W.D.Mo.1997) (holding that forcing a "plethora of individual issues into a class action constitutes a disservice to both potential class members and the Defendant" because of manageability issues, fairness and human nature). *Cf. Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 67 (S.D.Ohio 1991) (finding that in class action brought by residents within six miles of radioactive materials plant, "Common issues of liability, causation, and remedies not only predominate but overwhelm individualized issues. If these claims were tried separately, the amount of repetition would be manifestly unjustified.").

In *Ford Motor Company Ignition Switch Products Liability Litigation*, 194 F.R.D. 484, the plaintiffs sought class certification in an action against defendant for damages caused by allegedly faulty ignition switches. The plaintiffs in *Ignition Switch Products Liability Litigation* proposed a two-step litigation plan similar to that proposed by plaintiffs in this case. *Id.* at 495. In the first

---

8. Plaintiffs argue strenuously that most states' product liability laws are similar. In support of their argument, plaintiffs have filed an appendix of the laws of each state regarding the type of product liability claims asserted by plaintiffs in this case. (Supp.Ex. S–10). Plaintiffs claim that the proof required under the relevant Ohio statutes will satisfy the elements of at least one cause of action in every other state. One obvious problem is the issue of strict liability. According to plaintiffs, forty-three states have adopted the strict liability standards set forth in the Restatement of Torts. Thus, several require proof of negligence. Plaintiffs point out that a negligence claim has been plead in this case. However, in their Reply Brief, plaintiffs apparently abandoned this claim, arguing only the theories of defective design and failure to warn. Other differences exist as well. For example, Delaware analyzes product liability claims under breach of warranty principles, Louisiana applies a risk/benefit test and eighteen jurisdictions (including Ohio) apply a consumer expectations test. Plaintiffs argue, nonetheless, that the elements of proof under all these tests are essentially the same.

In *In the Matter of Rhone–Poulenc*, 51 F.3d 1293, 1300 (7th Cir.1995), the court stated that while the law of negligence, including subsidiary concepts such as duty of care, foreseeability, and proximate cause, may differ only in nuance, "nuance can be important, and its significance is suggested by a comparison of differing state pattern instructions on negligence and differing judicial formulations." Similarly, the Sixth Circuit in *American Medical Systems* stated, "If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action." 75 F.3d at 1085.

stage, a class trial would be held wherein the plaintiffs would attempt to prove that the defendants sold vehicles with defective ignition switches in violation of implied warranties and deceptive trade practice laws. *Id.* In the second stage, the defendants could address issues of individual causation. *Id.* The court found that the plaintiffs' class action plan would not constitute the superior method of adjudication, stating,

> [T]here are numerous factual issues in this case that cannot be adjudicated on a class-wide basis, and each individual vehicle owner and his/her witnesses would be subject to cross-examination on the particular facts and circumstances surrounding that vehicle owner's purported ignition switch fire....[E]ven if the presumption of causation were available from plaintiffs' successful pursuit of the first phase trials for the various classes and subclasses, individual proofs would have to tie that presumption to the facts of the individual claims, and defense experts, or perhaps fact witnesses, could be expected to testify that the fire did not start in the relevant area of the car, or that it had a separate cause....The geographical logistics of such a trial would be formidable, and perhaps prohibitive, for individual claimants from around the country to travel to this Court to try their claims.

*Id.* at 496.

Similarly, even if plaintiffs were able to prove that the Powder and Spray were defective and/or that defendant was liable for failure to warn, each individual plaintiff would have to prove he or she had an adverse reaction which was caused by the products. Defense experts or fact witnesses could be expected to testify that the adverse reaction was caused by something other than defendant's products. The number and geographical diversity of the members of the proposed class weigh against the superiority of class action certification.

Even if class certification in this case would promote some efficiency with regard to establishing defendant's conduct, this Court does not find a class action to be the superior method of adjudicating plaintiffs' claims.

*Conclusion*

For these reasons, Plaintiffs' Motion for Class Certification is denied.

IT IS SO ORDERED.